[Sac. No. 6153. In Bank. Dec. 19, 1951.]

JOHN DEERE PLOW COMPANY OF MOLINE (a Corporation), Appellant, v. FRANCHISE TAX BOARD, etc., Respondent.

Kent &. Brookes, Arthur H. Kent, Valentine Brookes, John S. Best and Lewis D. Wilson for Appellant.

Fred N. Howser and Edmund G. Brown, Attorneys General, James E. Sabine and Irving H. Perluss, Deputy Attorneys General, for Respondent.

SPENCE, J.—Plaintiff brought this action to recover an additional franchise tax assessed against it for the taxable year 1938, based upon income for the year 1937, under authority of the Bank and Corporation Franchise Tax Act (Stats. 1929, p. 19, as amended; 2 Deering's Gen. Laws 1937, Act 8488, p. 3851) and paid under protest. The trial court found in defendant's favor, and from the judgment accordingly entered, plaintiff appeals.

The sole point in controversy is the propriety of the Franchise Tax Commissioner's application of a three-factor formula in measure of plaintiff's net income from business done within this state for the year involved. Plaintiff maintains that such formula attributes to California income derived wholly from business done without this state, so that such allocation is not only contrary to the governing act but likewise is objectionable as violative of the due process and equal protection of the law clauses of the Fourteenth Amendment. But an examination of the record in the light of settled legal principles sustains the use of the challenged formula as a reasonable method of apportionment for determining plaintiff's franchise tax liability in this state, and accordingly the judgment must be affirmed.

At all times herein mentioned plaintiff was an Illinois corporation, authorized to do business within this state, which business consisted of the sale of a full line of agricultural machinery, implements, and tractors at wholesale to dealers. It maintained a jobbing house in San Francisco to serve the states of California, Arizona and part of Nevada, and in addition, it did a certain amount of exporting to the Orient. It also owned and operated four other jobbing houses, each serving trade in the surrounding territory and respectively located at Moline, Illinois; Omaha, Nebraska; Portland, Oregon; and Salt Lake City, Utah.

All of plaintiff's capital stock was owned by Deere and Company, an Illinois corporation, which was engaged in the business of manufacturing and selling farm equipment, with operations extending from the purchase of raw materials to the distribution of the finished products. Deere and Company also owned the capital stock of some 83 other corporations—manufacturing plants, factories, jobbing houses, and retail outlets—integrated into the general flow of business of Deere and Company in its production, handling and marketing of a full line of farm equipment. The various acquired

companies functioned in the overall operations of Deere and Company in the following manner: different items were produced in the several manufacturing plants and factories, with the production process regulated so there would be no overlapping; the manufactured products were then transferred to Deere and Company, which in turn consigned them to the subsidiary jobbing corporations, and the latter thereupon disposed of the goods either through their own retail outlets or through independent retail dealers. In furtherance of the overall business, Deere and Company maintained at its offices a central purchasing department for quantity buying of the raw materials needed for the affiliated factories and manufacturing plants; a central financial department for negotiating bank loans, with Deere and Company advancing funds to the subsidiary companies as required; a central research laboratory for testing and improving the products of the factories; a central sales department for directing sales activities, fixing maximum terms and minimum prices to be observed by the jobbing houses, prescribing dealers' uniform contracts for said houses, and setting forth general policies on all sales matters; a central traffic department for arranging freight routing in response to orders from the jobbing houses as part of the marketing function; a central advertising department for publication of a trade magazine and circulars, as well as for placement of national advertising; and a central insurance department for supervision of all insurance coverage for the properties and personnel of the affiliated companies. These and other central administrative departments in the Deere and Company organization established general management policies and operating procedures. Among important matters of policy determined by Deere and Company were volume discounts to be allowed by each jobbing house to retail dealers, warranties, retail store operations, accounting procedure, and pension plans affecting all the employees in the organization. Many of these matters were covered in branch house bulletins regularly sent by Deere and Company to its affiliated companies; the latter in turn rendered monthly accounts to Deere and Company as to financial status and operating expenses; and the jobbing houses, in reporting sale transactions, remitted to Deere and Company excess funds to be applied against their respective net accounts. Considerable freedom of action was allowed the local managers of the various jobbing houses so long as they kept within the broad outline of policy established by

the central management. By such unity in ownership and control of the affiliated companies, Deere and Company effected substantial savings in the organization's integrated activities.

In 1934 Deere and Company entered into a distribution arrangement with the Caterpillar Tractor Company to meet a competitive trade development. That year the International Harvester Company and Allis-Chalmers Manufacturing Company, both of which produced lines of farm machinery competitive with the Deere line, commenced to manufacture track-type tractors and so provided their distributors with a decided advantage in being able to offer customers a complete line of agricultural equipment—tractors plus the implements to be used with them. While Deere and Company manufactured wheel-type tractors along with its line of farm machinery, it did not manufacture track-type tractors. On the other hand, Caterpillar did manufacture track-type tractors but not the farm equipment to be used with them. In recognition of their mutual business interest, the Deere organization and Caterpillar arranged to have their respective products handled together by the same dealers, thus offering a full line of tractor and complementary farm equipment on a competitive basis with International Harvester and Allis-Chalmers. This connection with Caterpillar also enabled the Deere organization to develop its industrial as well as agricultural business so that it was not so completely dependent upon the farmer trade. Thus Caterpillar distributors throughout the country could handle the sale of Deere wheel-type tractors to industrial users so as to promote the use of such tractors with Caterpillar road machinery and other industrial equipment. The arrangement with Caterpillar was effected as a matter of policy by Deere and Company for general application to the entire organization.

The competitive situation was particularly acute on the West Coast in that differences in topographical, climatic and soil conditions as compared with other parts of the country caused track-type tractors to be much more widely used in that area than the wheel-type machines. This situation caused plaintiff to make some basic changes in its method of doing business pursuant to the arrangement between Deere and Company and Caterpillar to use common dealers, who would sell the combined products of both organizations to all classes of customers. In plaintiff's San Francisco trade territory the Caterpillar dealers were more strongly established,

and accordingly plaintiff's San Francisco house discontinued doing business with practically all of its former dealers, numbering approximately 250, and began marketing its goods through Caterpillar distributors. Upon this basis plaintiff reduced its selling outlets to 44—retaining 25 of its old dealers as established in isolated communities and replacing its other dealer customers with 19 new Deere-Caterpillar distributors.

The use of former Caterpillar dealers for the distribution of the Deere line of products in the trade territory of plaintiff's San Francisco jobbing house necessitated plaintiff's undertaking an extensive program of education with regard to the selling and servicing of such goods; and additional salesmen were employed to visit the new dealers and acquaint them with the Deere output. Plaintiff's repair and service departments in the San Francisco territory were revised and expanded, staffed with additional trained employees, and equipped with facilities to provide equivalent maintenance and care for both lines of goods. Upon the termination of its accounts with many of its former dealer customers, plaintiff's San Francisco house had to arrange for the goods in their hands either to be transferred to the new Deere-Caterpillar distributor who took over that part of the San Francisco trade territory or returned to plaintiff's San Francisco jobbing house. In some instances, after initial transfer to the new dealer, the old goods would subsequently be returned to plaintiff's San Francisco jobbing house for credit. The handling of all this merchandise by plaintiff's San Francisco jobbing house involved considerable checking and reconditioning of the goods, as well as the renting of additional storage space, with a resulting increase in warehouse and transfer expenses for plaintiff's San Francisco house.

The bulk of the goods sold by plaintiff's San Francisco house was purchased from Deere and Company for a price determined by applying agreed discounts to the minimum resale price of the goods to the retail dealers. Deere and Company charged the same uniform price to all jobbing houses in the organization for the various lines of goods, adjusting, of course, for freight differentials. The prices and terms so fixed for plaintiff's San Francisco house allowed it a gross profit margin from its sales comparable to that realized by the other jobbing houses operating in the Deere organization. However, in plaintiff's San Francisco trade territory the change in the dealer outlets markedly affected

not only the expenses but also the income of the San Francisco house. Thus the new dealers, stronger and better financed as established Caterpillar distributors than the former Deere dealers with plaintiff's San Francisco house, were able to take greater advantage of the cash and volume discount rates allowed to plaintiff's dealers; and also the financial resources of the new dealers did not make it necessary for them to ask plaintiff for the rediscount of farmers' paper as received on the sale of goods. Upon such basis plaintiff claims that net income of its San Francisco jobbing house was materially reduced.

For the taxable year 1938 plaintiff filed an amended franchise tax return showing a California net income of $70,-446.79, according to its separate accounting system, and the tax computed thereon was paid. Thereafter plaintiff received notice of an additional tax assessment of $12,167.53, based upon the commissioner's determination of plaintiff's California net income in the total amount of $378,047.71, computed through use of a three-factor formula—property, payroll and sales—in allocating to plaintiff's California business a percentage of net income out of the consolidated net income of all the affiliated companies in the Deere organization. After protest had been made and overruled by the Franchise Tax Commissioner, plaintiff paid the additional assessment plus interest, and then filed this action for recovery of such payment.

Section 10 of the Bank and Corporation Franchise Tax Act, as in effect during the period here involved, provided that "if the entire business . . . is not done within this State, the tax shall be according to or measured by that portion thereof which is derived from business done within this State . . . determined by an allocation upon the basis of sales, purchases, expenses of manufacturer, pay roll, value and situs of tangible property, or by reference to these or other factors, or by such other method of calculation as is fairly calculated to assign to the State the portion of net income reasonably attributable to the business done within this State and to avoid subjecting the taxpayer to double taxation." (2 Deering's Gen. Laws 1937, Act 8488, pp. 3851, 3858; Stats. 1929, p. 19; amended by Stats. 1931, p. 2226; Stats. 1935, p. 965.)

Plaintiff does not question the Franchise Tax Commissioner's determination that its California business was part of the unitary enterprise of Deere and Company as a multistate manufacturing and selling organization, and it concedes that

formula allocation ordinarily produces a reasonable measure of taxing values for franchise tax purposes where a unitary business is involved. The commissioner here used the three factor formula of property, payroll and sales in computing the net income of plaintiff's San Francisco house, considered as an integral unit in the entire business comprising Deere and Company and all its affiliated companies. (*Edison California Stores, Inc.* v. *McColgan*, 30 Cal.2d 472, 475 [183 P.2d 16].) Such formula has been recognized as embracing factors sufficiently diversified to reflect "the relative contribution of the activities in the various states to the production of the total unitary income" so as to allocate to California its just proportion of the profits earned from a unitary business. (*Butler Brothers* v. *McColgan*, 17 Cal.2d 664, 678 [111 P.2d 334]; aff. 315 U.S. 501, 509 [62 S.Ct. 701, 86 L.Ed. 991].) Its fairness in the apportionment of unitary income to sources within and without the state has been declared settled (*Edison California Stores, Inc.* v. *McColgan, supra*, 30 Cal.2d 472, 479), consistent with "practical administrative difficulties that necessarily arise in fixing upon a workable formula for general application." (*El Dorado Oil Works* v. *McColgan*, 34 Cal.2d 731, 738 [215 P.2d 4].) However, plaintiff maintains that here, as shown by its separate accounting system, the formula used has produced unreasonable results by assigning to this state extraterritorial values in the apportionment of the unitary income, and it therefore may not serve as an appropriate measure of its California franchise tax. But an analysis of the record fails to sustain plaintiff's position.

Plaintiff claims that the impropriety of the formula in question stems from its disregard of differences in both the expenses of operation and the productivity of income from the three factors of property, payroll, and sales in relation to its Californa business for the tax period involved. As shown by the accounting records, prepared at the home office of Deere and Company and covering the nine affiliated jobbing houses in the organization but treating them as separate entities, plaintiff submits that its San Francisco house was not conducted so profitably as other jobbing houses in the national system. In this connection it refers to these conditions of variation from the national average as found by the trial court: that in 1937 "the San Francisco ratio was $6.76 in wages and salaries for each $100 of sales, whereas the average ratio for all included United States houses was $4.46,"

a difference of almost 50 per cent; that "in net tangible assets . . . the San Francisco ratio was $18.26 invested for each $100 of sales, whereas the average ratio for all included United States houses was $6.76," a difference of nearly 200 per cent; that "in selling and general expenses . . . the San Francisco ratio was $13.676 of such expenses for each $100 of sales, whereas the average ratio for all included United States houses was $8.781," a difference of about 64 per cent; and that "the cash and volume discounts allowed to customers of the San Francisco jobbing house . . . were substantially higher in relation to sales than were such discounts allowed, on the average, by the other United States jobbing houses" in the organization. The trial court found that these accounting records were "accurately kept according to generally accepted accounting practices and . . . truly reflected" the ratio of the respective factors to the "gross receipts from sales." In this state of the record showing "proof of variations from the norm," plaintiff maintains that the formula operates to distort the productivity of its California business and cannot work properly in reasonably reflecting the proportionate part of the unitary income attributable to this state.

But in so arguing plaintiff fails to take into account the underlying concept of formula apportionment in the allocation of income from a unitary business: that the unitary income is derived from the functioning of the business as a whole, to which the activities in the various states contribute; and that by reason of such interrelated activities in the integrated overall enterprise, the business done within the state is not truly separate and distinct from the business done without the state so as reasonably to permit of a segregation of income under the separate accounting method rather than use of the formula method in assigning to the taxing state its fair share of taxable values. (*Butler Brothers* v. *McColgan, supra,* 17 Cal.2d 664, 667-668; *Edison California Stores, Inc.* v. *McColgan, supra,* 30 Cal.2d 472, 477-479; *El Dorado Oil Work* v. *McColgan, supra,* 34 Cal.2d 731, 735.) As above stated, here the overall organization of Deere and Company was a manufacturing and selling business having its operations extending into a number of different states and providing an example of a typical unitary business subject to formula allocation as a reasonable method of apportionment for franchise tax purposes. (*Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113 [41 S.Ct. 45, 65 L.Ed. 165]; *Bass,*

*Ratcliff & Gretton, Ltd.* v. *State Tax Com.,* 266 U.S. 271 [45 S.Ct. 82, 69 L.Ed. 282] ; *North American Cement Corp.* v. *Graves,* 299 U.S. 517 [57 S.Ct. 311, 81 L.Ed. 381] ; *International Harvester Co.* v. *Evatt,* 329 U.S. 416 [67 S.Ct. 444, 91 L.Ed. 390].) ■ The fact that the taxpayer may show that according to a separate accounting system, the activities in the taxing state were less profitable than those without the state, or even resulted in a loss, does not preclude use of a formula as a method of apportionment of the unitary income. (*Ibid.*) The only requirement is that the formula used be not intrinsically arbitrary or produce an unreasonable result. Such was the situation in the case of *Hans Rees' Sons* v. *State of North Carolina,* 283 U.S. 123 [51 S.Ct. 385, 75 L. Ed. 879], where the court recognized the unitary character of the business as a manufacturing and selling enterprise extending into several states and to which a formula method of apportionment was appropriate, but refused to approve the particular formula employed for the reason that it consisted simply of the property factor and failed to give proper weight to the extensive activities of the company without the state, so that the result reached was unreasonable. (See *Butler Brothers* v. *McColgan, supra,* 17 Cal.2d 664, 673; *Southern Pac. Co.* v. *McColgan,* 68 Cal.App.2d 48, 60 [156 P.2d 81].)

■ In the apportionment of a unitary business the formula used must give adequate weight to the essential elements responsible for the earning of the income (*Butler Brothers* v. *McColgan, supra,* 315 U.S. 501, 509 [62 S.Ct. 701, 86 L.Ed. 991] ; see *Pacific Fruit Express Co.* v. *McColgan,* 67 Cal.App. 2d 93, 100 [153 P.2d 607]) and must not include income unconnected with the unitary business (*People ex rel. Alpha Portland Cement Co.* v. *Knapp,* 230 N.Y. 48 [129 N.E. 202, 204-205], cert. den. 256 U.S. 702 [41 S.Ct. 624, 65 L.Ed. 1179] ; also *Fargo* v. *Hart,* 193 U.S. 490, 501-502 [24 S.Ct. 498, 48 L.Ed. 761] ; *Union Tank Line Co.* v. *Wright,* 249 U.S. 275, 282-293 [39 S.Ct. 276, 63 L.Ed. 602] ; *Southern Pac. Co.* v. *McColgan, supra,* 68 Cal.App.2d 48, 82; see Altman and Keesling, Allocation of Income in State Taxation, 2d ed., 1950, p. 97), but its propriety in a given case does not require that the factors appropriately employed be equally productive in the taxing state as they are for the business as a whole. Varying conditions in the different states wherein the integrated parts of the whole business function must be expected to cause individual deviation from the national average of the factors in the formula equation, and yet the mutual

dependency of the interrelated activities in furtherance of the entire business sustains the apportionment process. (*North American Cement Corp.* v. *Graves, supra*, 299 U.S. 517; *Ford Motor Co.* v. *Beauchamp*, 308 U.S. 331, 336 [60 S.Ct. 273, 84 L.Ed. 304].) Thus in the case of *Crane Co.* v. *Carson*, 191 Tenn. 353 [234 S.W.2d 644], cert. den. 340 U.S. 906 [71 S. Ct. 282, 95 L.Ed. 655], the taxpayer was engaged in a unitary business consisting of a manufacturing and selling enterprise extending into several states. In challenge of the use of the statutory formula for apportionment of the overall business done within the taxing state, the taxpayer introduced voluminous records, according to its separate accounting system, to show that its factory in the taxing state suffered enormous losses by reason of unusual expenses for the tax period involved: increased payrolls upon the hiring of additional personnel, extended capital expenditures for enlargement and improvement of the manufacturing plant, and cost of reconversion from wartime to peacetime needs. The business as a whole was profitable. In upholding the statutory allocation formula as fairly calculated to assign to the taxing state that portion of the net income of the unitary business reasonably attributable to business done within its borders and involving no assessment of extraterritorial values, the court expressly noted that the taxpayer sought to treat the factory in question as "a separate entity" and "as though it did not maintain any retail sales organization," so that no consideration was given to their respective integrated contributions to the successful operation of the overall enterprise. (P. 645 [234 S.W.2d].)

A like situation prevails here in that plaintiff argues that unusual conditions affecting the conduct of its San Francisco jobbing house preclude reasonable application of the three-factor formula. Thus it refers to the effect of the above-mentioned Caterpillar transaction on its California business as involving an increase of operating expenses—through expanded payrolls, added repair and service facilities, extended warehouse handling and transfer charges—and a decrease in productive financial return—through the greater demand for cash and volume discount allowances on sales to the new strongly financed dealers. While plaintiff admits that the sales of its San Francisco jobbing house were slightly more productive of gross income than were the sales of the other

United States jobbing houses in the overall system (24.673 per cent as against 23.668 per cent, or an amount of $29,-765.44 in favor of the San Francisco house above the average), it maintains that this advantage was more than offset by the substantially higher operating expenses of that house. But these expenses are not chargeable only to the San Francisco jobbing house and without regard for their effect on the business of the organization as a whole. As the record shows, the Caterpillar transaction was not an arrangement confined to plaintiff's San Francisco house as a local expedient, but was of general application to the entire organization as a matter of national policy and adopted as such by the directors of Deere and Company. By such arrangement both Deere and Company and Caterpillar were able to meet a serious competitive condition, which though more acute on the West Coast, nevertheless prevailed to a limited extent in other trade territories served by the jobbing houses in the Deere organization. Moreover, the arrangement gave Deere and Company an opportunity to develop on a national scale an industrial as well as an agricultural business, entailing not only an overall increase in business through entry of its farm equipment into the new field but also less dependence upon the farmer trade. As such matter of national policy, the Caterpillar transaction is not properly segregable to the San Francisco jobbing house in sole reduction of the income from its sales in view of the fact that it contributed to the advantageous operation of the entire business.

Likewise the property investments and payroll expenses of plaintiff's San Francisco jobbing house are not segregable solely to California business and in disregard of the unitary business of which it is an integrated part. In the balance of the three factors of the formula—property, payroll, and sales—the operation of the portion of the unitary business within one state is dependent upon or contributes to the operation of the unitary business without the state, and the California business of plaintiff's San Francisco jobbing house may not fairly be considered as a unit separate not only from other jobbing houses in the entire system but also from the manufacturing activities in the national enterprise. (*Underwood Typewriter Co.* v. *Chamberlain*, *supra*, 254 U.S. 113, 120-121; *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Com.*, 266 U.S. 271, 282 [45 S.Ct. 82, 69 L.Ed. 282].) █ With regard to a unitary business, the place where expenses affecting the entire business are incurred has little or no bearing on the

question of how such expenses should be allocated. Thus, in the situation here involving the manufacture and sale of goods as a composite enterprise, selling expenses in one state may logically affect the amount of income realized from sales in other states through the following chain of processes: more sales in the aggregate, calling in turn for an increase in production, resulting in a reduced per unit cost, in consequence of spreading certain fixed or more or less constant charges over a broader base and increasing purchasing power so as to lessen the cost per unit of raw material, with the decrease in unit cost of goods manufactured causing an increase in the profit or income gained from sales in other states. Equally appropriate here is the statement made in *Crane Co.* v. *Carson, supra,* 234 S.W.2d 644, at page 646, in relation to the propriety of formula allocation of unitary income from a manufacturing-selling enterprise: ". . . the final stage in the complainant's operation is the retail sale. However, the sale is merely the act by which the income is captured which has been the result of the complainant's entire operation, commencing with the purchase of raw material, its manufacture, and the transportation and distribution of the manufactured product to the final sale by the retail outlet.'' The same observation may be made with respect to plaintiff's property investments in California redounding to the benefit of the entire organization.

Nor does the fact that the trial court found that the accounting records of plaintiff's San Francisco jobbing house accurately set forth its California sales and operating expenses preclude the further finding that such "records . . . during the period involved did not accurately reflect the income of the plaintiff attributable to its operations and property within the State of California for said period." There is "no necessary inconsistency between the accuracy and fairness of the taxpayer's accounting and the different result obtained by the formula method of allocating income" (*Edison California Stores, Inc.* v. *McColgan, supra,* 30 Cal.2d 472, 483) since a "particular accounting system, though useful or necessary as a business aid, may not fit the different requirements when a State seeks to tax values created by business within its borders" (*Butler Brothers* v. *McColgan, supra,* 315 U.S. 501, 507 [62 S.Ct. 701, 86 L.Ed. 991]), so that for "taxation purposes the one does not impeach the other." (*Edison California Stores, Inc.* v. *McColgan, supra,* p. 483.)

Plaintiff argues that contrary to the situation in *Butler*

*Brothers* v. *McColgan, supra,* 17 Cal.2d 664, 677, it has not "failed to show a variance from normal in either the California sales, property or payroll, or in either expenses or revenues," and that accordingly its showing responds to the test prescribed in *Norfolk & Western Ry. Co.* v. *North Carolina,* 297 U.S. 682, 688 [56 S.Ct. 625, 80 L.Ed. 977], in providing "clear and cogent" evidence "directed to each of [the related terms] alike" in the formula so as to establish the unfairness of its application in the particular circumstances here involved. But regardless of the fact that the formula equation is not framed on the assumption that there must be uniformity of operating revenues and expenses in the relative functions of the various units contributing to the earnings of an integrated multistate business, an assumption which would be "contrary to notorious facts" (see *Norfolk & Western Ry. Co.* v. *North Carolina, supra,* p. 688 [297 U.S.]), plaintiff's evidence is directed solely to prevailing ratio deviations affecting the selling activities of the Deere organization severed from the interrelated processes. Thus plaintiff shows merely that according to the three factors of the formula—property, payroll, and sales—its San Francisco jobbing house has not been so productive of income as other jobbing houses in the Deere organization; and so maintains that the formula, though fair on its face as representing a proper balance of accepted income producing factors (Silverstein, Problems of Apportionment in Taxation of Multistate Business, 4 Tax L.Rev. [1949], pp. 207, 258; Altman and Keesling, Allocation of Income in State Taxation, 2d ed., 1950, p. 37), works unfairly here. Such partial showing on the basis of plaintiff's separate accounting system misconceives the whole purport of the unit rule of assessment as resting on the principle that "where a business is unitary in character, so that its separate parts cannot be fairly considered by themselves and the whole business in the several states derives a value from the unity of use, allocation of income upon a reasonable formula is properly sustained." (*Butler Brothers* v. *McColgan, supra,* 17 Cal.2d 664, 673; see, also, 315 U.S. 501, 507-508 [62 S.Ct. 701, 86 L.Ed. 991].)

Plaintiff does not suggest that another formula embracing different factors would produce a more accurate apportionment of the unitary business of the Deere organization done within and without the state (*cf. Pacific Fruit Express Co.* v. *McColgan, supra,* 67 Cal.App.2d 93, 95; *El Dorado Oil Works* v. *McColgan, supra,* 34 Cal.2d 731, 735-736), but it

takes the position that notwithstanding the unitary character of the business, a separate accounting method furnishes an adequate measure of the activities of an integral part of that business—a proposition which has been consistently rejected by the courts. (*Edison California Stores, Inc.* v. *McColgan, supra,* 30 Cal.2d 472, 480-481.) The fact that plaintiff, unlike the taxpayer in *Butler Brothers* v. *McColgan, supra,* 17 Cal. 2d 664, 665, in computing its California income according to its separate accounting system, has not taken any deduction for a pro rata amount of central office expenses or service charges, is of no significance insofar as determining the propriety of the use of a formula method of allocation. Although, as plaintiff maintains, such circumstance does indicate that it "has not sought the benefits of allocation of certain items while at the same time seeking to escape the burdens of allocation with respect to others," such claim of deduction was manifestly not the basis of the *Butler Brothers* v. *McColgan* decisions. (17 Cal.2d 664; 315 U.S. 501.)

 A state in attempting to place upon a business extending into several states "its fair share of the burden of taxation" is "faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders" (*Underwood Typewriter Co.* v. *Chamberlain, supra,* 254 U.S. 113, 121), and as a matter of practical tax administration it has been "declared that 'rough approximation rather than precision' is sufficient." (*International Harvester Co.* v. *Evatt, supra,* 329 U.S. 416, 422.) As the record has been here analyzed, and particularly in the light of the decision in *Edison California Stores, Inc.* v. *McColgan, supra,* 30 Cal.2d 472, plaintiff's San Francisco jobbing house operated as an integrated unit in the Deere organization, a manufacturing-selling enterprise, providing the advantages of a unitary business through "unity of ownership, unity of operation by centralized purchasing, management, advertising and accounting, and unity of use in the centralized executive force and general system of operation." (Pp. 479-480.) Consistent with these observations, the three-factor formula in its application to plaintiff's San Francisco jobbing house appears to have "fairly calculated" the portion of the unitary income of the Deere organization "attributable to the business done within this state," and as so computed it is not open to constitutional objection as operating to tax extraterritorial values. (*Edison California Stores, Inc.* v. *McColgan, supra,* 30 Cal.2d 472, 483; *Butler Brothers* v. *McColgan, supra,* 315 U.S. 501, 507-509;

*International Harvester Co.* v. *Evatt, supra,* 329 U.S. 416, 422-423.) It therefore follows that the trial court properly sustained the additional franchise tax assessed against plaintiff for the year in question. (*Underwood Typewriter Co.* v. *Chamberlain, supra,* 254 U.S. 113; *Bass, Ratcliff & Gretton, Ltd.* v. *State Tax Com., supra,* 266 U.S. 271.)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Schauer, J., concurred.