[Civ. No. 48666. First Dist., Div. Four. Mar. 24, 1982.]

ANACONDA COMPANY, Plaintiff and Respondent, v.
FRANCHISE TAX BOARD, Defendant and Appellant.

**COUNSEL**

George Deukmejian, Attorney General, Edward P. Hollingshead and Charles C. Kobayashi, Deputy Attorneys General, for Defendant and Appellant.

Peter Anderson, R. Tyler Andersen, Fred A. Rodriguez and Thelen, Marrin, Johnson & Bridges for Plaintiff and Respondent.

**OPINION**

**CHRISTIÁN, J.**—The Franchise Tax Board appeals from a judgment awarding to respondent Anaconda Company refund of $3,423,349.32 taxes paid under the Bank and Corporations Tax Law for income years of 1955 through 1969 inclusive. The court also awarded interest on the disputed amount. The question on appeal is whether, under undisputed facts, the trial court acted correctly when it determined that Anaconda was not engaged in a unitary business with its Chilean and Mexican subsidiaries.

The case was decided on stipulated facts supplemented by oral and documentary evidence received at trial. During the years in question, Anaconda was a Montana corporation engaged in the production of copper and other basic materials. Its corporate headquarters and principal place of business were located in New York City. Anaconda conducted business in California and throughout the United States. The pertinent subsidiaries of Anaconda had the following status:

1. Anaconda Aluminum Company, a wholly owned subsidiary of Anaconda, produced and sold aluminum products in the United States. Anaconda Aluminum was a Montana corporation with its principal place of businesss in Louisville, Kentucky; its United States facilities included two sales offices in California.

2. Anaconda American Brass Company, a wholly owned Anaconda subsidiary, manufactured brass products. American Brass was a Connecticut corporation with its principal place of business in Waterbury, Connecticut; it did business throughout the United States including California.

3. Anaconda Wire and Cable Company, a wholly owned subsidiary of Anaconda after 1963, manufactured products derived from copper. Wire and Cable was a Delaware corporation with its principal place of business in New York City and with sales offices and manufacturing plants in California.

4. Anaconda Electronics Company (Anaconda Electronics), a wholly owned subsidiary of Wire and Cable, was primarily in the business of producing community television equipment. Anaconda Electronics was a Delaware corporation with its principal offices in California.

5. Anaconda Sales Company (Anaconda Sales) was a wholly owned Delaware corporation with its principal place of business in New York; it did no business in California. Anaconda Sales marketed the products of the Chilean companies on a commission basis. Anaconda Sales provided complete sales services and developed new markets for the Latin American companies.

6. International Smelting and Refining Company (ISARCO) was a wholly owned Montana corporation operating a major industrial facility and plant in New Jersey; it did no business in California. ISARCO processed a significant proportion of the Chilean production during the years at issue.

7. Anaconda's Chilean and Mexican operating companies, Andes Copper Mining Company (Andes), Chile Exploration Company (Chilex), Santiago Mining and Cananea Consolidated Copper Company, S.A. (Cananea), along with certain domestic affiliates of Anaconda, did no business in California and thus were not California taxpayers.

8. Chilex was a New Jersey corporation wholly owned by Chile Copper, a 99 percent owned Delaware corporation. Chilex had mineral properties, processing facilities, and offices in the Republic of Chile, and an administrative office in New York City.

9. Andes was a Delaware corporation with 99 percent ownership by Anaconda. Andes had mineral properties, processing facilities, administrative and business offices in Chile.

10. Santiago Mining Company was a Delaware corporation wholly owned by Anaconda with mineral properties located in Chile. Santiago is not of major significance in this action.

11. Cananea was a Mexican corporation wholly owned by Greene Cananea, a 99 percent owned Minnesota corporation. Cananea had mineral properties, processing facilities, and offices in Mexico.

Anaconda conceded for the purpose of its claim for tax refund that its domestic group constituted a unitary business. The parties recognize that Anaconda's smaller Chilean company, Santiago Mining, should be treated in the same manner as the two larger Chilean companies, Andes and Chilex.

Anaconda, as the nation's second largest copper producer, was principally engaged in producing copper within the continental United States. Anaconda owned and operated two major copper mines in the United States. The refined copper sold by Anaconda was identical to that sold by Anaconda's competitors. Anaconda's primary contact with California consisted of copper and other mineral sales to California purchasers, involving products mined and processed elsewhere. The company had no administrative or executive offices in this state and was present only as the result of its ownership of several small mines which produced materials other than copper. American Brass and Wire and Cable operated fabricating plants in California and had warehouses and sales distribution centers to serve the California market for manufactured copper products. The raw materials necessary for these California plants were normally supplied either from Anaconda production or purchases from independent copper producers. These California fabricators did not import foreign materials and did not normally obtain refined copper from any foreign source. Anaconda's California operations were only a small part of Anaconda's business.

Anaconda's three affiliates doing business in Chile (Andes, Chilex, and Santiago Mining) were engaged in mining and processing copper and metal byproducts. Andes and Chilex, along with Braden Copper Corporation, a subsidiary of Kennecott Copper Corporation, were the three major Chilean producers of copper. The copper industry was a

major source of export earnings for Chile during the relevant time period.

The Chilean subsidiaries maintained offices in Santiago, Chile; accounting, purchasing, legal services, government liaison, personnel processing, local sales and public relations were functions performed in Santiago. Mining and all business operations were controlled by a general manager who ordinarily came from the United States. The Chilean companies refined some of their copper at an ISARCO facility in New Jersey.

Cananea, Anaconda's Mexican mining company, operated separately from the Chilean companies. Cananea maintained offices in Mexico City and conducted extraction and processing operations at its Mexican mine. Nearly all refining was performed by an independent Mexican corporation.

None of the Latin American companies explored or sold within the United States. Chilex maintained an administrative office in Anaconda's corporate headquarters; the office included an accounting and financial staff serving Chilex and Andes. The New York Chilex office also recruited personnel for assignment to Chile or Mexico. Numerous officers of the Latin American companies were based in New York, and the boards of the Chilean companies met in New York.

Many members of Anaconda's board and executive committee were also members of the boards of the Latin American companies, ISARCO and Anaconda Sales. Some of these persons served simultaneously as officers of Anaconda, the Latin American companies and other Anaconda subsidiaries. Officers of the Latin American companies often participated at executive committee meetings and submitted reports pertaining to Latin American operations. The Anaconda executive committee was informed of major developments and problems involving the Latin American companies. An informal operating committee composed of certain officers and operating personnel of the Latin American companies was based in New York. There was an overlap of personnel between Anaconda's executive committee and the operating committee, and a representative of the operating committee often met with Anaconda's executive committee. The boards of directors of Anaconda and its Chilean subsidiaries all met in Anaconda's New York headquarters. Cananea's board met in Mexico.

Many Anaconda officers had been employed at one time or another by Latin American companies, but Anaconda had no systematic policy of transfer among its affiliates. Anaconda's personnel department recruited employees for Chilex' New York offices. Personnel decisions pertaining to senior officers of Anaconda and its Latin American companies were subject to approval by Anaconda's executive committee; other personnel decisions were made by the individual companies. Employees of the Latin American companies who were hired in the United States enjoyed the same insurance and retirement plans as Anaconda employees. Certain key Latin American employees participated in the stock option program open to key employees of Anaconda. Latin American companies provided their own health care programs and retirement benefits for employees not otherwise covered. Transferee officers or employees normally retained accrued benefits.

Anaconda performed, at cost, purchasing and other administrative services in the United States and in Europe for the benefit of its subsidiaries. New York approval was required for all appropriations requesting machinery, equipment, tools and parts for the Latin American subsidiaries. Anaconda provided geological engineering services for the Latin American companies.

Anaconda participated in financial planning for the Latin American companies, including decisions as to when to issue additional stock. Anaconda made substantial loans to the Chilean companies and guaranteed several loans for the Latin American companies. All loans were repaid by the Latin American companies. The secretary-treasurer of the Latin American companies in New York, who was also usually the secretary-treasurer of Anaconda, supervised the investment of inactive funds and handled short term security investments for Anaconda and the Latin American companies. The Latin American companies maintained their own accounting departments. However, Anaconda's controller performed functions for Latin American companies as well as for Anaconda. Anaconda periodically audited the Latin American companies.

The Chilean companies sold their production in diverse markets including Western Europe, Latin America and the United States. Copper prices were relatively stable until 1966. The Chilean companies sold most of their production to industrial users in Western Europe, but some of the Chilean product was sold to affiliated customers, American Brass and Wire and Cable, at the prevailing United States price for

Chilean copper. Cananea sold nearly all of its production locally. No sales of any Latin American copper were made for delivery to California, and no sales activity was conducted in California for the benefit of any Latin American companies.

Chilean law from February 1952 to May 1955 authorized the Central Bank of Chile to purchase the entire output of the major producers at the prevailing United States price. The companies were required to continue production and resell the production for the highest possible price with the profit accruing to the benefit of the Central Bank. The foreign-controlled Chilean copper industry also was subjected to heavy taxation and to currency exchange controls.

In 1955, the Chilean government altered the tax base of the major producers. Sales were subjected to the control of the Copper Department, an agency of the government of Chile. The Copper Department was vested with broad powers to promote the production and industrialization of copper in Chile. The Copper Department was financed by exactions upon the gross revenues of the major producers. The Copper Department required the producers to sell copper to national industries at a discount and make copper available for Chilean manufacture. In 1964, the threat of greater governmental intervention in the copper business led to an agreement between the Chilean subsidiaries and the government requiring Chilex and Andes to make substantial local investments and to increase their refining capacity. The 1964 agreement called for the Chilean corporations to expand their operations and provided for the creation of mining companies of mixed ownership.

In 1966, Andes and Chilex entered into a "Memorandum of Understanding" with the Chilean government providing for certain participation by the government in the proceeds of the companies' sales of copper. This arrangement resulted in a reduction of approximately $23 million in the companies' sales receipts over the 6-month period of the agreement. Andes and Chilex also were required to participate in a program of "compulsory loans" to the Chilean government introduced by the Chilean Readjustment Laws of 1968 and 1969. Andes and Chilex paid approximately $26 million in interest-free "loans" in 1968 and 1969. Finally, in 1971, the operations of the major foreign producers were expropriated.

Concurrently, the United States government was putting pressure on its domestic copper industry to roll back prices. The United States gov-

ernment embargoed for defense purposes exports of scrap copper. The government also required copper producers to reserve a certain proportion of their production for orders related to national defense and to make reports to the Department of Commerce.

Cananea held its mining properties under concessions from the Mexican government. Cananea paid royalties in the form of production taxes. Cananea sold nearly all of its production locally at a price determined under Mexican law. Most of Cananea's supply requirements were subject to import controls; these controls forced Cananea to purchase locally despite higher prices and lower quality. In 1961, the Mexican government called for Mexicanization of the mining industry. Cananea was Mexicanized in 1971.

The trial court concluded that "the mutuality relationship of dependency or contribution required for a single unitary business under California Revenue and Taxation Code section 25101 was not present during the years at issue as between Anaconda's Latin American companies ... and the Anaconda domestic group of companies doing business in the United States." The trial court further determined that "the unities of use and operation required for a single unitary business under Revenue and Taxation Code section 25101 were not present as between the Latin American companies ... and the domestic group. [¶] Moreover, irrespective of any other aspects of the relationship between the Latin American companies and the Anaconda domestic group in the United States, unity of ownership and control did not exist between the Latin American companies and the domestic group due to the continuous and pervasive intervention of the respective host country governments of Chile and Mexico."

Appellant contends that respondent's California and out-of-state operations comprise a unitary enterprise subject to the California formula for income apportionment. Extensive testimony and voluminous documentary exhibits were received in evidence, but the essential facts of the case are undisputed. Since the issues here involve the application of taxing statutes to uncontradicted facts, this court is confronted purely with a question of law and is not bound by the findings of the trial court. (*Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal.App.3d 988, 993 [173 Cal.Rptr. 121]; *Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 381 [47 Cal. Rptr. 848].)

■ The basic principles applicable to this case were reviewed in this court's opinion in *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988. A corporate taxpayer's income must be subjected to apportionment[1] when it "is derived from or attributable to sources both within and without the state...." (Rev. & Tax. Code, § 25101; *Honolulu Oil Corp.* v. *Francise Tax Bd.* (1963) 60 Cal.2d 417, 425 [34 Cal.Rptr. 552, 386 P.2d 40]; *Superior Oil Co.* v. *Franchise Tax Bd.* (1963) 60 Cal.2d 406, 417 [30 Cal.Rptr. 545, 386 P.2d 33]; *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 994.) "The fairness of allocating to California a just proportion of the profits earned from a unitary business[2] is settled." (*Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal. App.3d 988, 994; see *Butler Bros.* v. *McColgan* (1942) 315 U.S. 501, 509 [86 L.Ed. 991, 997, 62 S.Ct. 701]; *El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731, 738 [215 P.2d 4], app. dism., 340 U.S. 801 [95 L.Ed. 589, 71 S.Ct. 52]; *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472, 478 [183 P.2d 16]; *Butler Bros.* v. *McColgan* (1941) 17 Cal.2d 664, 667-668 [111 P.2d 334], affd. in 315 U.S. 501 [86 L.Ed. 991, 62 S.Ct. 701]; *Handlery* v. *Franchise Tax Board, supra,* 26 Cal.App.3d 970, 974.)

---

[1]The California method of apportionment is explained in Keesling and Warren, *The Unitary Concept in the Allocation of Income* (1960) 12 Hastings L.J. 42, 43: "Under the formula method the business activities within the state are considered to be an inseparable part of a business carried on both within and without the state. The total gross income from the entire business is determined. The allowable deductions are then subtracted and the remaining net income is apportioned within and without the state by means of an allocation formula consisting of various factors which are thought to be relevant in the production of income, such as property, payroll, and sales."

[2]Keesling and Warren also discuss the unitary treatment of multicorporate enterprises (*op. cit. supra,* 12 Hastings L. J. 42, 57): "In any case where a business would be considered unitary if conducted by one taxpayer, it should likewise be so considered even though conducted by two or more affiliated corporations. Just as a state may look beyond its borders and take into account the entire income of a business in arriving at a determination of the amount of income reasonably attributable to the activities conducted within the state, so in the case of a group of affiliated corporations engaged in the conduct of a business, it may look at the total income of the group to determine the amount of income attributable to the portion of the business conducted within the state by one or more of the members of the group."

The fairness of the formula apportionment method is explained as follows: "[T]he 'formula' apportionment of unitary business income has not only been found to be constitutionally permissible, but ... it is often the only reasonable and practical manner in which a state may levy and collect taxes to which it is constitutionally entitled. It might be described as a sort of rule of necessity, having its origin in the accommodation of a state's constitutional right to tax income derived from within the state, to constitutional due process of law and interstate commerce provisions." (*Handlery* v. *Francise Tax Board* (1972) 26 Cal.App.3d 970, 974 [103 Cal.Rptr. 465], app. dism., 410 U.S. 921 [35 L.Ed.2d 582, 93 S.Ct. 1373].)

The propriety of applying the unitary concept in taxing foreign corporations was established in *Butler Bros.* v. *McColgan, supra,* 17 Cal. 2d 664. As the court there noted, it is only in circumstances where the corporation's California business is "truly separate and distinct from its business without this state, so that the segregation of income may be made clearly and accurately, that the separate accounting method may properly be used." (*Id.,* at pp. 667-668.) The court set out a three-part test to determine the unitary nature of a taxpayer's business: "(1) Unity of ownership; (2) Unity of operation as evidenced by central purchasing, accounting and management divisions; and (3) Unity of use in its centralized executive force and general system of operation." (*Id.,* at p. 678, quoted in *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 995; see *Honolulu Oil Corp.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 417, 423; *Superior Oil Co.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 406, 412; *John Deere Plow Co.* v. *Franchise Tax Bd.* (1951) 38 Cal.2d 214, 229 [238 P.2d 569], app. dism., 343 U.S. 939 [96 L.Ed. 1345, 72 S.Ct. 1036]; *Edison California Stores* v. *McColgan, supra,* 30 Cal.2d 472, 478; *Chase Brass & Copper Co.* v. *Franchise Tax Bd.* (1970) 10 Cal.App.3d 496, 502 [95 Cal.Rptr. 805], app. dism. 434 U.S. 1029 [54 L.Ed.2d 777, 98 S.Ct. 759]; *Standard Register Co.* v. *Franchise Tax Board* (1968) 259 Cal.App.2d 125, 129 [66 Cal.Rptr. 803].)

■ Respondent challenges the first element, unity of ownership. Although the parent corporation owned the foreign subsidiaries, respondent argues that pervasive intervention in the subsidiaries' operations by the foreign governments undermined the parent corporation's nominal ownership and control. Unquestionably the host governments regulated and intervened in the subsidiaries' activities. Nevertheless, the parent corporation owned virtually 100 percent of the Latin American subsidiaries. Governmental regulations, which restrict the exercise of some familiar attributes of ownership, do not establish that there was no unity of ownership. Up until the time of expropriation unity existed with respect to some substantial attributes of ownership, i.e., the right to exclude other private entities from intruding upon the owned properties. A second element, unity of operation, depends on diverse factors. No one element controls the decision. (*Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 995.) Intercompany copper sales between the Chilean companies and Anaconda's domestic unitary operation is one factor demonstrating operational unity. (See *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 995; *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.

App.3d 496, 502, cert. den. 400 U.S. 961 [27 L.Ed.2d 381, 91 S.Ct. 365].) Respondent assisted its foreign subsidiaries in its purchasing requirements. Purchasing ties between parent and subsidiary are of some relevance. (*Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 995; *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 503.)

Although the Latin American companies maintain their own accounting departments, Anaconda made periodic internal audits of Latin American company records. Anaconda also provided statistical material for the Latin American companies. This overlap in auditing is a further factor pointing toward operational unity. (See *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 996.)

Anaconda made several substantial intercompany loans to the Chilean subsidiaries and guaranteed several loans obtained by the foreign subsidiaries. A common secretary-treasurer handled the Chilean subsidiaries' banking transactions in the United States, as well as short term and excess fund investments. These loans serve as "substantial evidence of unity of operation." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 503, quoted in *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 996.)

Employees of respondent who transferred to the foreign subsidiaries were allowed to continue their employee benefits. (See *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 996-997.) Decisions regarding high level personnel were subject to approval by Anaconda's executive committee. Employees of the foreign subsidiaries who were hired in the United States enjoyed the same disability and retirement benefits as Anaconda employees. Furthermore, some employees of the subsidiaries participated in a stock option plan which covered key Anaconda employees.

Anaconda provided engineering and geological services for the foreign subsidiaries. Anaconda provided important administrative services for its foreign subsidiaries which is a relevant factor in determining unity of operation. (See *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 503.) Anaconda served as a source of legal planning and public relations information. The indications of unity of operation were thus overwhelming.

The third element, unity of use, relates to executive forces and operational systems. (*Superior Oil Co.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 406, 415; *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 997; *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 504.). "The integration of major executive functions is a factor of great importance pointing toward unity." (*Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 998; see *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 504.) There was significant overlap between Anaconda's board of directors and executive committee and the boards of directors of the foreign subsidiaries. Many Anaconda officers also were key officers of the foreign subsidiaries. Board meetings were generally held at Anaconda headquarters. The Anaconda board of directors were advised of Latin American operating conditions. Major policy matters were subject to review by Anaconda. (See *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 998; *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal. App.3d 496, 504.) Furthermore, financial reports were submitted from the subsidiary to the parent corporation; this is to be accorded some significance. (*Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 998; *Standard Register Co.* v. *Franchise Tax Board, supra,* 259 Cal.App.2d 125, 136.) It is apparent from the significant overlap of personnel that control on the highest level was exerted by respondent. (See *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 998.)

The requisite unities exist here. The combination of all the factors and ties between the parent and the subsidiaries supports appellant board's determination that the operation is unitary. Respondent engaged in the same general business activities as its subsidiaries. The administrative regulations indicate that a strong inference of a unitary business exists where the taxpayer is engaged in the same type of business.[3] (See *Container Corp. of America* v. *Franchise Tax Bd., supra,*

---

[3]California Administrative Code, title 18, section 25120, subdivision (b), provides in part: "The determination of whether the activities of the taxpayer constitute a single trade or business or more than one trade or business will turn on the facts of each case. In general, the activities of the taxpayer will be considered a single business if there is evidence to indicate that the divisions under consideration are integrated with, dependent upon or contribute to each other and the operations of the taxpayer as a whole. The following factors are considered to be good indicia of a single trade or business; and the presence of any of these factors creates a strong presumption that the activities of the taxpayer constitute a single trade or business:

"(1) *Same type of business*: A taxpayer is generally engaged in a single trade or

117 Cal.App.3d 988, 1000.) This administrative construction of the California tax laws "is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." (*Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1]; also see *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 647 [335 P.2d 672]; *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 1000; *Albright* v. *State of California* (1979) 101 Cal.App.3d 14, 18 [161 Cal.Rptr. 317]; *Cal. Correctional Officers' Assn.* v. *Board of Administration* (1978) 76 Cal.App.3d 786, 793-794 [143 Cal.Rptr. 125]; *Clayton* v. *County of Los Angeles* (1972) 26 Cal.App.3d 390, 396 [102 Cal.Rptr. 687].)

Respondent's California business was dependent upon or contributed to the operation of its business outside the state. (*Superior Oil Co.* v. *Franchise Tax Bd., supra,* 60 Cal.2d 406, 412; *Edison California Stores* v. *McColgan, supra,* 30 Cal.2d 472, 481; *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 1001; *Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 501.)

Respondent relies on *Chase Brass & Copper Co.* v. *Franchise Tax Bd.* (1970) 10 Cal.App.3d 496, to support the trial court's determination. In *Chase,* the court considered, among other issues, whether Braden, a copper producer, and Chase, a manufacturer, were unitary; both were subsidiaries of the same parent company, Kennecott Copper Corporation. In its discussion of the unitary principle, the court noted that the functions of a vertically integrated enterprise are "not so markedly unitary as they are in a horizontally integrated business." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 502.) In that Braden and Chase were involved in different aspects of the copper business, they would be considered vertical and thus less likely to be unitary. Ultimately, the court held that "[e]xcept for the matter of sales and joint ownership, Braden and Chase are not unitary. We support the conclusion of the trial court to this extent." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 10 Cal.App.3d 496, 506.)

---

business when all of its activities are in the same general line. For example, a taxpayer which operates a chain of retail grocery stores will almost always be engaged in a single trade or business."

The situation here is distinguishable in that, first, both Anaconda and the Latin American subsidiaries were involved in the mining aspect of the copper business. Thus, unlike *Chase Brass*, the taxpayer and the subsidiary in question here are in a horizontal rather than a vertical relationship. Moreover, the extensive factual background of this case also supports the conclusion that the businesses are unitary. In addition to the factors of joint sales and ownership mentioned in *Chase*, here there was evidence, absent in *Chase*, of extensive operational ties in areas such as purchasing, personnel, accounting, loans and engineering services. There was also uncontradicted evidence of integration of major executive functions such as overlap on the boards of directors and in the key officer positions of the companies.

Respondent's foreign subsidiaries are subject to inclusion in the apportionment base. Respondent's constitutional objections to this taxing formula were amply discussed and dismissed in *Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal.App.3d 988, 1003-1007 [173 Cal.Rptr. 121]; that analysis need not be repeated here.

■ Respondent asserts that critical issues were not reached by the trial court and a remand is therefore required. Specifically, the trial court deemed it unnecessary to determine:

"(a) Whether the Franchise Tax Board's standard three-factor formula was the proper one for apportioning unitary business income to California under assessments which included the Latin American companies within the California unitary group.

"(b) Whether the Franchise Tax Board's assessments correctly stated net unitary business income on the basis of a California unitary group which included the Latin American companies."

Essentially Anaconda claims that the formula, as applied, was arbitrary and unreasonable in that, first, it failed to take into account the differences in production values between the United States and Latin America, and second, to allow proper adjustments to the income of the Latin American companies on account of the ongoing interventions of the host governments of Chile and Mexico.

The underlying factual matters were covered by the trial court's findings based on the stipulation and the supplementary evidence. The determinative facts include: that the three-factor formula was utilized to

apportion the income; that the formula was not adjusted for variance in Latin American productivity; and that "in keeping with its normal treatment of multinational corporate groups, the Franchise Tax Board made no adjustments whatsoever for any corporate income or production taxes paid by Latin American companies to Chile or Mexico." Because these pertinent facts have been determined without dispute, this court may make its own determinations of the questions of law presented by respondent as to the appropriateness of the formula utilized. (*Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal. App.3d 988, 993 [173 Cal.Rptr. 121].)

Appellant Franchise Tax Board normally employs a three-factor property-payroll-sales formula to apportion unitary business income to California.[4] "[T]he Board's discretion to use the three-factor formula has been upheld by an unbroken series of California decisions." (*Chase Brass & Copper Co.* v. *Franchise Tax Bd.* (1977) 70 Cal.App.3d 457, 467 [138 Cal.Rptr. 901] [*Chase II*]; *John Deere Plow Co.* v. *Franchise Tax Bd.* (1951) 38 Cal.2d 214, 222 [238 P.2d 569]; *El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731, 738 [215 P.2d 4], app. dism., 340 U.S. 801 [95 L.Ed. 589, 71 S.Ct. 52]; *Edison California Stores* v. *McColgan* (1947) 30 Cal.2d 472, 479 [183 P.2d 16].)

Respondent concedes that the intrinsic fairness of the formula is settled, but challenges the formula as applied in the circumstances of its particular unitary business.

"'The Franchise Tax Board is given discretion in the selection of [the] factors to be utilized in a tax formula [citation] and where, as here, the taxpayer contends that the formula is arbitrary and reaches an unreasonable result, the burden is on the taxpayer to establish such facts by clear and convincing evidence.' (See *Butler Bros.* v. *McColgan, supra,* 315 U.S. 501, 507 ....)" (*McDonnell Douglas Corp.* v. *Fran-*

---

[4]The formula is applied in the following manner: "'The percentage of the firm's total real property and tangible personal property in California is computed; the percentage of the firm's total payroll of wages, salaries and commissions paid to employees in California is computed; the percentage of the firm's gross sales, less returns and allowances, in California is computed. The three percentage figures are totaled and the resulting sum is then divided by three. The final figure applied to total business income represents the percentage of the total net business income of a firm which can be allocated to California.'" (*Chase Brass & Copper Co.* v. *Franchise Tax Bd., supra,* 70 Cal.App. 3d 457, 467, fn. 12; see Wahrhaftig, *Allocation Factors in Use in California* (1960) 12 Hastings L.J. 65.)

*chise Tax Bd.* (1968) 69 Cal.2d 506, 512 [72 Cal.Rptr. 465, 446 P.2d 313].)

In light of the "practical administrative difficulties that necessarily arise in fixing upon a workable formula for general application" (*El Dorado Oil Works* v. *McColgan, supra,* 34 Cal.2d 731, 738), the only requirement to be met is that "the formula used be not intrinsically arbitrary or produce an unreasonable result. . . . In the apportionment of a unitary business the formula used must give adequate weight to the essential elements responsible for the earning of the income . . . but its propriety in a given case does not require that the factors appropriately employed be equally productive in the taxing state as they are for the business as a whole. Varying conditions in the different states wherein the integrated parts of the whole business function must be expected to cause individual deviation from the national average of the factors in the formula equation, and yet the mutual dependency of the interrelated activities in furtherance of the entire business sustains the apportionment process." (*John Deere Plow Co.* v. *Franchise Tax Bd., supra,* 38 Cal.2d 214, 224-225.)

Respondent first claims that the formula as applied produced an unreasonable result in that it failed to give recognition to the "vast differences in production values and business conditions as between the United States and Latin America. . . . [T]his disparity results in an apportionment of income to the State far in excess of any amount reasonably attributable to Anaconda's California operations."

An identical assertion was rejected by this court in *Container Corp. of America* v. *Franchise Tax Bd., supra,* 117 Cal.App.3d 988, 1003-1004, where the taxpayer contended that "the application of the apportionment formula to foreign subsidiaries fails to account for different wages, property costs and returns on sales." (*Id.,* at p. 1003.) Variations in profitability *within* the United States have not precluded apportionment of income according to an appropriate formula; similarly, where the variations occur between domestic and foreign subsidiaries, an appropriate formula may still be applied. (*Id.*; see also *John Deere Plow Co.* v. *Franchise Tax Bd., supra,* 38 Cal.2d 214, 224-225.)

Respondent points out that the exhibits to the stipulation of facts indicate that there is a marked difference in the factors of payroll, property and sales, as a function of productivity, between its Latin American and domestic operations. Such variations also exist within the

United States and have not been held to preclude unitary treatment. (*Container Corp. of America v. Franchise Tax Bd., supra,* 117 Cal. App.3d 988, 1003.) No showing has been made which would justify an exception to unitary treatment for respondent's Latin American operations. In short, respondent's evidence does not meet the burden of showing by "'clear and cogent evidence' that [the formula] results in extraterritorial values being taxed." (*Butler Bros. v. McColgan, supra,* 315 U.S. 501, 507 [86 L.Ed. 991, 996]; *N & W Ry. Co. v. No. Carolina* (1936) 297 U.S. 682, 688 [80 L.Ed. 977, 982, 56 S.Ct. 625].)

Respondent next claims that the formula was improper as applied in that no adjustments were made for the costs imposed on it by the governments of Chile and Mexico. Respondent emphasizes the failure of the formula to take account of the income taxes paid by it to the governments of Chile and Mexico. It argues that, although labeled as "income taxes," the taxes were in effect "royalty" or "participation" payment taxes and thereby deductible.

"Taxes on or according to or measured by income or profits . . . imposed by the authority of . . . any foreign country" are explicitly made nondeductible by statute. (Rev. & Tax. Code, § 24345, subd. (a)(2).) The taxes imposed on Anaconda by the Mexican and Chilean governments fall within this statutory mandate. Furthermore, "exemptions from taxation must be found in the statute" (*Market St. Ry. Co. v. Cal. St. Bd. Equal.* (1955) 137 Cal.App.2d 87, 96 [290 P.2d 20]); and statutes granting exemptions from taxation must be reasonably, but nevertheless strictly construed against the taxpayer (*Standard Oil Co. v. State Bd. of Equalization* (1974) 39 Cal.App.3d 765, 769 [114 Cal. Rptr. 571]). The taxpayer has the burden of showing that he clearly comes within the exception and any doubts must be resolved against the right to an exemption. (*Id.*) Respondent has failed to meet this burden; its arguments must therefore be rejected.

In conclusion, the statistical evidence presented by respondent fails to show that the application of the apportionment formula to its unitary operations yields a distorted result. Furthermore, respondent fails to account for the contributions to income which result from the functional integration and centralization of management which exist in a unitary operation. "The very notion of a unitary business implies that the taxpayer's affairs within and outside the taxing jurisdiction are so indivisible that income from property and activities within the jurisdiction cannot be measured without taking into account income from

property and activities located elsewhere." (*Luckenbach S.S. Co.* v. *Franchise Tax Bd.* (1963) 219 Cal.App.2d 710, 719 [33 Cal.Rptr. 544].)

Respondent has failed to meet its burden to make oppression manifest by clear and cogent evidence. (*El Dorado Oil Works* v. *McColgan, supra,* 34 Cal.2d 731, 744.) Thus, the Franchise Tax Board's allocation formula based on the three-factor tax base—payroll, property and sales —appears, in its application to Anaconda's unitary enterprise, to have been an honest effort to apportion to California that part of its income fairly attributable to business done within the state. "No method of allocation can precisely determine the exact amount of income attributable either to any given geographic area or to any given part of a series of business transactions culminating in the realization of a profit, and 'any effort' in that regard 'must be more or less arbitrary and fictitious' [citation] as a matter of practical tax administration. In short, as was . . . said by the Supreme Court of the United States in sustaining the validity of a franchise tax assessment, the 'practical impossibility of a state's achieving a perfect apportionment of expansive, complex business activities . . . [makes] "rough approximation rather than precision" · ∴. sufficient' in the formula allocation of income from a unitary business." (*Id.,* at p. 741.)

Under this principle, the formula as applied to respondent's income from its unitary enterprise met the requisite standard; as a result, respondent's challenge must fail.

The judgment is reversed with directions to render judgment for appellant.

Caldecott, P. J., and Rattigan, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 26, 1982.