[No. B081329. Second Dist., Div. Four. Apr. 22, 1996.]

BROWN GROUP RETAIL, INC., Plaintiff and Respondent, v. FRANCHISE TAX BOARD, Defendant and Appellant.

824

COUNSEL

Daniel E. Lungren, Attorney General, Edmond B. Mamer and Philip C. Griffin, Deputy Attorneys General, for Defendant and Appellant.

Bryan Cave, Juan D. Keller, Joseph R. Halprin and Norman H. Lane for Plaintiff and Respondent.

OPINION

HASTINGS, J.—The Franchise Tax Board of the State of California (FTB) appeals from a judgment entered against it and in favor of Brown Group Retail, Inc., successor by merger to Wetherby-Kayser Shoe Company, a Missouri corporation (Brown), awarding Brown a refund of franchise taxes paid for tax years ending in 1976 through 1981.

The FTB's appeal deals primarily with the trial court's determination that Brown was immune from California franchise taxes pursuant to title 15, United States Code section 381, also known as Public Law No. 86-272 (section 381). The FTB contends that this finding was error. As a fallback position, FTB argues Brown is part of a unitary group doing business in California and the trial court erred by determining that California payroll and sales attributed to Brown should not be included within the numerator of the tax formula to decide the amount of tax owed by the unitary group.

We conclude that the trial court did err in finding that Brown was immune from franchise tax payments by reason of section 381. Therefore, we need not address the FTB's second argument.

STATEMENT OF THE CASE

Through a series of mergers, respondent Brown, a Missouri corporation, is the successor to the assets, liabilities and business of Wetherby-Kayser Shoe Company, a California corporation (Wetherby-Kayser). Brown is also a wholly owned subsidiary of Brown Group, Inc. (BGI), also a Missouri corporation. Brown is primarily engaged in the manufacture and sale of shoes.

Wetherby-Kayser filed California franchise tax returns with the FTB for the income years ending October 31, 1976, through October 31, 1981. In February 1985, FTB issued notices of assessment to Wetherby-Kayser, claiming a deficiency in the amount of franchise taxes paid for the above-mentioned income years. Under protest, Wetherby-Kayser paid the claimed deficiencies, which totaled over $300,000. After unsuccessfully pursuing its administrative remedies, Brown filed a complaint in the superior court in April 1993 for refund of the payment.

A court trial was conducted in October 1993, based upon undisputed facts. These facts primarily concerned the activities of BGI and its employees within the State of California. The trial court held that the evidence established that the activities of BGI's employees within California consisted of mere solicitation of orders, and thus BGI was immune from the imposition of California franchise taxes pursuant to section 381. The court then rejected the FTB's claim that the payroll attributed to California employees and the sales made in California by Brown should have been included in calculating the amount of taxes owned by the unitary group of BGI.

STATEMENT OF FACTS

*The business of Brown*

During each of the tax years at issue, Brown manufactured and distributed shoes and other footwear products, which it sold to thousands of independent and unrelated entities nationwide as well as to several related shoe retailing companies. It did not maintain any warehouse, store, factory, office or other facility in California. It also owned no real or tangible personal property in California, except for automobiles which it leased for exclusive use by its sales representatives. Brown's principal place of business is located in Clayton, Missouri, a suburb of St. Louis.[1]

No sales of Brown products were made in California. Instead, orders would be sent from customers in California to the home office and the goods would be shipped to the customers by carriers from outside California.

Brown had two categories of employees who acted on its behalf in California during this period of time: 14 sales representatives, and 2 representatives of its independent retail distributor division (IRD). We focus primarily upon these latter employees.

*IRD activities*

Brown used its California IRD employees to provide a service to independent retail distributors, free of charge, to help the retailers establish and enhance their retail outlets. No other competing shoe companies provided similar services to their customers. These employees were not used to solicit sales from customers; that was the job of the 14 sales employees who were compensated on a commission basis. IRD employees assisted both new and existing retailers.

Richard Gimblett was vice-president and general sales and marketing manager of the men's division of the Brown Shoe Company, a division of BGI from 1976 through 1981. He testified at trial to the role of IRD: "Their function was to help an independent retailer perform a better business." "To enhance their business to try to make a better retailer from each individual who had a store." "The IRD guy is to a degree—to a good degree a teacher. He is going to teach the individual that owns the store how to get a better

---

[1]FTB argues that a sales office maintained by sales representative Cecil Oppenheim at his own expense during this period of time prevents section 381 from being available to Brown. Because we reach the merits based upon other activity, we do not reach the merits of this argument.

inventory turn. How to run a cleaner business. How to trim his windows. How to housekeep the store. . . . The IRD individual would work with the salesmen with the idea of enhancing the . . . retailer in that territory the salesman was working with."

When an IRD employee was advised that an established retailer wanted to open a new California store, or a prospective retailer wanted to open a store in California, the IRD employee either performed, or assisted the retailer in performing, the following functions: financial analysis to determine the feasibility and potential for the new business; site selection; lease negotiations; store design; training office personnel; and assisting with sales seminars.

An IRD employee assisted established retailers in the daily operation of their stores by helping with the following activities: layout of advertising programs; merchandising displays; store remodeling; bookkeeping—they would provide the retailer with a bookkeeping system for laymen and instruct them on how to use it; and inventory and merchandise planning and control.

In addition to the above services, IRD would facilitate applications for loans from Brown to help retailers expand or open new stores. Retailers who sold only Brown products were eligible for loans from Brown equal to 60 percent of the needed capital, while dealers who sold Brown products as well as other products were eligible for loans equal to 30 percent. The loans would be approved by corporate headquarters in Missouri. In addition, IRD assisted retailers in expanding or relocating stores to suburban malls. The IRD employee would photograph potential new stores, take measurements, and draw up rough floor plans. The drawings and measurements would then be sent to Brown designers in Missouri. When the plans were finalized by the Brown employees in Missouri, they would be sent back to the IRD employee in California, who would review them with the retailer.

Certain activities were not allowed to be performed by IRD personnel: accepting orders from retailers; taking possession of Brown products which were to be returned; maintaining or possessing any Brown products for their own inventory; collecting delinquent accounts; counseling retailers with regard to insurance programs; or charging dealers for their services.

In other words, the business of the IRD employees was not to solicit sales for Brown. Instead, IRD helped develop new business opportunities for retailers and aided existing retailers in expanding their businesses, with the hope that Brown would benefit by means of increased sales.

## DISCUSSION

### Standard of review

The parties agree that resolution of the first issue turns on whether or not, under the facts presented, Brown falls within the immunity for taxation provided by section 381. As previously noted, the evidence before the court was undisputed. This is conceded by both parties to the appeal. However, the parties disagree upon the standard of review to be utilized by this court. FTB argues that because the facts were undisputed we review the case de novo and draw our own independent conclusion whether the facts fall within section 381 immunity or not. Brown urges that we must review the case based upon the substantial evidence standard.

This issue was addressed in *Anaconda Co.* v. *Franchise Tax Board* (1982) 130 Cal.App.3d 15 [181 Cal.Rptr. 640]: "Extensive testimony and voluminous documentary exhibits were received in evidence, but the essential facts of the case are undisputed. Since the issues here involve the application of taxing statutes to uncontradicted facts, this court is confronted purely with a question of law and is not bound by the findings of the trial court. (*Container Corp. of America* v. *Franchise Tax Bd.* (1981) 117 Cal.App.3d 988, 993 [173 Cal.Rptr. 121]; *Automatic Canteen Co.* v. *State Board of Equalization* (1965) 238 Cal.App.2d 372, 381 [47 Cal.Rptr. 848].)" (*Id.* at p. 23; see also *Standard Register Co.* v. *Franchise Tax Board* (1968) 259 Cal.App.2d 125, 129-130 [66 Cal.Rptr. 803].)

We review the matter de novo, applying the law to the uncontradicted evidence.

### Section 381 and the Wrigley decision

Section 381 provides in pertinent part: "No State, . . . shall have power to impose, for any taxable year . . . , a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following: [¶] (1) the solicitation of orders . . . in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and [¶] (2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1)." (15

U.S.C. § 381.) ▮ In this instance, we are dealing with subdivision (a)(1), and our focus is on the term "solicitation of orders."

Application of section 381 in connection with state sales activities was directly addressed by the United States Supreme Court in *Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co.* (1992) 505 U.S. 214 [120 L.Ed.2d 174, 112 S.Ct. 2447]. The issue was whether salesmen of the William Wrigley Company, the world's largest manufacturer of chewing gum, were carrying out activities in Wisconsin beyond the scope of immune activities recognized in section 381. Because a review of the facts in *Wrigley* is important to our determination, we set them out at length.

*The facts in Wrigley:*

Wrigley's home office was in Chicago and it divided the country into districts, regions and territories. The midwestern district included a Milwaukee region which covered most of Wisconsin and parts of other states. The district manager for the midwestern district had his residence and company office in Illinois and visited Wisconsin only six to nine days each year, usually for a sales meeting or to call on important accounts. (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co., supra,* 505 U.S. at p. 217 [120 L.Ed.2d at pp. 181-182].)

The regional manager for Milwaukee resided in Wisconsin, but Wrigley did not provide him with a company office. He spent 80-95 percent of his time working with the sales representatives in the field or contacting key accounts. The remainder of his time was spent in administrative duties: writing and reviewing reports, recruiting new sales representatives, making recommendations about the hiring and firing of sales representatives, and evaluating their performances. He would also preside at full-day sales strategy meetings for all representatives once or twice a year. The manager from 1973-1976, John Kroyer, generally held these meetings in the basement of his home which he used as an office, unreimbursed by Wrigley. The succeeding sales manager, Gary Hecht, would hold the meetings at a hotel or motel. Kroyer also intervened two or three times a year to help arrange a solution to credit disputes between the Chicago office and important local accounts. Hecht never engaged in such activities. (505 U.S. at p. 217 [120 L.Ed.2d at pp. 181-182].)

The sales, or field representatives, in the Milwaukee region resided in Wisconsin and were provided with company cars but not offices. They were also furnished with a supply of gum (with an average wholesale value of $1,000), a supply of display racks, and promotional literature. They kept

these materials at their homes or in their cars when visiting accounts. The sales representatives would visit accounts daily and hand out promotional material, free samples, and would directly request orders for Wrigley products. They would also engage in other activities designed to promote sales of product. For example they would supply free display racks to retailers, making sure they were prominently displayed. Usually the racks were filled with inventory already held by the retailer, but occasionally these racks would be filled from the stock kept by the salesmen. The representative would issue an "agency stock check," indicating the quantity supplied, this would be sent to Chicago and the retailer would be billed. The representatives also checked retail stock for freshness and would replace stale stock with fresh stock without charge to the retailer. At any given time 40 percent of the gum in possession of the representative would be stale gum that had been removed from retail stores. After accumulating a sufficient amount of stale gum it would either be shipped back to Chicago or be disposed of in a local Wisconsin landfill. (505 U.S. at pp. 217-218 [120 L.Ed.2d at pp. 181-183].)

Wrigley did not own or lease any real property in Wisconsin; nor did it operate a manufacturing, training or warehousing facility. It had no telephone listing or bank account in Wisconsin. All Wisconsin orders were sent to Chicago for acceptance and were filled by shipment through common carrier from outside the state. Credit and collection activities were all handled through Chicago, except the few noted by Kroyer two to three times a year. While Wrigley engaged in print, radio and television advertising in Wisconsin, the purchase and placement of the advertising was handled by an independent Chicago agency. (505 U.S. at p. 218 [120 L.Ed.2d at pp. 182-183].)

*The history of section 381:*

Prior to 1958, the case of *Norton Co.* v. *Illinois Dept. of Revenue* (1951) 340 U.S. 534 [95 L.Ed. 517, 71 S.Ct. 377], was the standard to determine whether the sales activities of a corporation were sufficient to protect it from taxation by the state in which the sales were solicited: " 'Where a corporation chooses to stay at home in all respects except to send abroad advertising or drummers to solicit orders which are sent directly to the home office for acceptance, filling, and delivery back to the buyer, it is obvious that the State of the buyer has no local grip on the seller. Unless some local incident occurs sufficient to bring the transaction within its taking power, the vendor is not taxable.' (*Id.* at p. 537.)" (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co., supra,* 505 U.S. at pp. 238-239 [120 L.Ed.2d at p. 195].)

In 1959 the United States Supreme Court decided the case of *Northwestern States Cement Co.* v. *Minn.* (1959) 358 U.S. 450 [3 L.Ed.2d 421, 79 S.Ct. 357]. In that case it noted that " 'net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same.' " (505 U.S. at p. 220 [120 L.Ed.2d at p. 184].) Shortly thereafter, the Supreme Court refused to hear appeals from the cases of *Brown-Forman Distill. Corp.* v. *Collector of Revenue* (1958) 234 La. 651 [101 So.2d 70], appeal dismissed, 359 U.S. 28 [3 L.Ed.2d 625, 79 S.Ct. 602] and *International Shoe Co.* v. *Fontenot* (1958) 236 La. 279 [107 So.2d 640], certiorari denied, 359 U.S. 984 [3 L.Ed.2d 933, 79 S.Ct. 943]. (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co., supra,* 505 U.S. at pp. 220-221 [120 L.Ed.2d at pp. 183-184].) The ruling in *Northwestern States Cement Co.* v. *Minn.* and the determination not to hear the other two cases apparently created confusion regarding what sales activities in a state qualified for immunity. This confusion was apparently the driving force behind enactment of section 381. (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co., supra,* 505 U.S. at pp. 221-222 [120 L.Ed. at pp. 184-185].)

In 1972 the Supreme Court reviewed the history of section 381 in *Heublein, Inc.* v. *South Carolina Tax Comm'n* (1972) 409 U.S. 275 [34 L.Ed.2d 472, 93 S.Ct. 483], and concluded that section 381 was " 'designed to define clearly a lower limit' for the exercise of state taxing power, and that 'Congress' primary goal' was to provide '[c]larity that would remove [the] uncertainty' created by *Northwestern States.* . . ." (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co., supra,* 505 U.S. at p. 223 [120 L.Ed.2d at p. 185].)

In *Wrigley* the court recognized that adoption of section 381 and review of the standard in *Heublein* had not cleared up confusion. The court noted: "experience has proved [section] 381's 'minimum standard' to be somewhat less than entirely clear. The primary sources of confusion, in this case as in others, have been two questions: (1) what is the scope of the crucial term 'solicitation of orders'; and (2) whether there is a *de minimis* exception to the activity (beyond 'solicitation of orders') that forfeits [section] 381 immunity." (505 U.S. at p. 223 [120 L.Ed.2d at p. 185].)

*The standard adopted in Wrigley:*

■ The court first addressed the term solicitation: " 'Solicitation,' commonly understood, means '[a]sking' for, or 'enticing' to, something, see

Black's Law Dictionary 1393 (6th ed. 1990); Webster's Third New International Dictionary 2169 (1981) ('solicit' means 'to approach with a request or plea (as in selling or begging)'). We think it evident that in the statute the term includes, not just explicit verbal requests for orders, but also any speech or conduct that implicitly invites an order. Thus, for example, a salesman who extols the virtues of his company's product to the retailer of a competitive brand is engaged in 'solicitation' even if he does not come right out and ask the retailer to buy some. The key question in this case is whether, and to what extent, 'solicitation of orders' covers activities that neither explicitly nor implicitly propose a sale." (505 U.S. at p. 223 [120 L.Ed.2d at p. 186].)

Turning to what is encompassed within the term "solicitation," the court noted: "That the statutory phrase uses the term 'solicitation' in a more general sense that includes *not merely the ultimate act of inviting an order but the entire process associated with the invitation* is suggested by the fact that [section] 381 describes 'the solicitation of orders' as a subcategory, not of in-state acts, but rather of in-state 'business activities'—a term that more naturally connotes courses of conduct. [Citation.] Moreover, limiting 'solicitation of orders' to actual requests for purchases would reduce [section] 381(a)(1) to a nullity. . . . And limiting it to acts 'essential' for making requests would engender endless uncertainty, contrary to the whole purpose of the statute. . . . It seems to us evident that 'solicitation of orders' embraces *request-related activity* that is not even, strictly speaking, essential, or else it would not cover salesmen's driving on the State's roads, spending the night in the State's hotels, or displaying within the State samples of their product. We hardly think the statute had in mind only day-trips into the taxing jurisdiction by empty-handed drummers on foot. [Citation.]" (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co., supra*, 505 U.S. at pp. 225-226 [120 L.Ed.2d at pp. 187-188], italics added and deleted.)

The majority rejected three suggested standards: "We reject this 'routinely-associated-with-solicitation' or 'customarily-performed-by-salesmen' approach, since it converts a standard embracing only a particular activity ('solicitation') into a standard embracing all activities routinely conducted by those who engage in that particular activity ('salesmen'). If, moreover, the approach were to be applied . . . on an industry-by-industry basis, it would render the limitations of [section] 381(a) toothless, permitting 'solicitation of orders' to be whatever a particular industry wants its salesmen to do." (505 U.S. at p. 227 [120 L.Ed.2d at p. 188].)

The court then turned to adoption of a proper standard: "We proceed, therefore, to describe what we think the proper standard to be. Once it is

acknowledged, as we have concluded it must be, that 'solicitation of orders' covers more than what is strictly essential to making requests for purchases, the next (and perhaps the only other) clear line is the one between those activities that are entirely ancillary to requests for purchases—those that serve no independent business function apart from their connection to the soliciting of orders—and those activities that the company would have reason to engage in anyway but chooses to allocate to its in-state sales force. . . . Providing a car and a stock of free samples to salesmen is part of the 'solicitation of orders,' because the only reason to do it is to facilitate requests for purchases. Contrariwise, employing salesmen to repair or service the company's products is not part of the 'solicitation of orders,' since there is good reason to get that done whether or not the company has a sales force. Repair and servicing may help to increase purchases; but it is not ancillary to requesting purchases, and cannot be converted into 'solicitation' by merely being assigned to salesmen. [Citation.]" (505 U.S. at pp. 228-229 [120 L.Ed.2d at pp. 189-190].), fn. and italics omitted.)

The court then applied this enunciated standard to the facts of the case.

"We conclude that the replacement of stale gum, the supplying of gum through 'agency stock checks,' and the storage of gum were not ancillary. As to the first: Wrigley would wish to attend to the replacement of spoiled product whether or not it employed a sales force. Because that activity serves [as] an independent business function quite separate from requesting orders, it does not qualify for [section] 381 immunity. [Citation.] Although Wrigley argues that gum replacement was a 'promotional necessity' designed to ensure continued sales, . . . *it is not enough that the activity facilitate sales; it must facilitate the requesting of sales, which this did not.* [¶] The provision of gum through 'agency stock checks' presents a somewhat more complicated question. It appears from the record that this activity occurred only in connection with the furnishing of display racks to retailers, so that it was arguably ancillary to a form of consumer solicitation. Section 381[, subdivision] (a)(2) shields a manufacturer's 'missionary' request that an indirect customer (such as a consumer) place an order, if a successful request would ultimately result in an order's being filled by a [section] 381 'customer' of the manufacturer, *i.e.*, by the wholesaler who fills the orders of the retailer with goods shipped to the wholesaler from out of state. [Citation.] ('Advice to retailers on the art of displaying goods to the public can hardly be more thoroughly solicitation. . . .') It might seem, therefore, that setting up gum-filled display racks, like Wrigley's general advertising in Wisconsin, would be immunized by [section] 381[, subdivision] (a)(2). What destroys this analysis, however, is the fact that Wrigley made the retailers

pay for the gum, thereby providing a business purpose for supplying the gum quite independent from the purpose of soliciting customers. Since providing the gum was not entirely ancillary to requesting purchases, it was not within the scope of 'solicitation of orders.' And because the vast majority of the gum stored by Wrigley in Wisconsin was used in connection with stale gum swaps and agency stock checks, that storage (and the indirect rental of space for that storage) was in no sense ancillary to 'solicitation.'

"By contrast, Wrigley's in-state recruitment, training, and evaluation of sales representatives and its use of hotel and homes for sales-related meetings served no purpose apart from their role in facilitating solicitation. The same must be said of the instances in which Wrigley's regional sales manager contacted the Chicago office about 'rather nasty' credit disputes involving important accounts in order to 'get the account and [Wrigley's] credit department communicating.' [Citation.] It hardly appears likely that this mediating function between the customer and the central office would have been performed by some other employee—some company ombudsman, so to speak—if the on-location sales staff did not exist. The purpose of the activity, in other words, was to ingratiate the salesman with the customer, thereby facilitating requests for purchases." (505 U.S. at pp. 233-235 [120 L.Ed.2d at pp. 192-193].), fns. omitted, italics added and deleted.)

Finally, the majority held that the nonsolicitation activities were not de minimis. (505 U.S. at p. 235 [120 L.Ed.2d at p. 193].)

The court reversed the Wisconsin Supreme Court by concluding: "Because Wrigley's business activities within Wisconsin were not limited to those specified in [section] 381, the prohibition on net-income taxation contained in that provision was inapplicable." (505 U.S. at p. 235 [120 L.Ed.2d at p. 193].)

*The dissent:*

Three dissenting justices offered a different standard.

First, they noted that normal acts of courtesy should be considered within the context of solicitation. "A salesperson cannot solicit orders with any degree of effectiveness if he is constrained from performing small acts of courtesy. [Citation.]" (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co., supra,* 505 U.S. at p. 242 [120 L.Ed.2d at p. 197] (dis. opn. of Kennedy, J.).) "No responsible company would expect its sales force to decline giving minimal assistance to a retailer in replacing damaged or stale product. In enacting [section] 381[, subdivision] (a), Congress recognized the importance of interstate solicitation to the strength of our national economy. The

statute must not be interpreted to repeal the rules of good sales techniques or to forbid common solicitation practices under the threat of forfeiting this important tax exemption. Congress acted to protect interstate solicitation, not to mandate inefficiency." (*Id.* at pp. 243-244 [120 L.Ed.2d at pp. 198-199].) The dissent concluded that the stocking of the gum display and replacement of stale gum fell within normal acts of courtesy that should be expected in connection with solicitation of sales.

The standard espoused in the dissent can reasonably be described as a "value added" test to be viewed from the perspective of the retailer: "The test I propose does not depend on the sellers' intentions or motives whatsoever; rather it requires an objective assessment from the vantage point of the reasonable buyer. If a reasonable buyer would consider the replacement of stale gum *to provide significant independent value*, then this service would subject Wrigley to taxation." (505 U.S. at p. 243 [120 L.Ed.2d at p. 198], italics added.) "The [majority] pursues a laudable effort to state a workable rule, but in the attempt condemns business activities *that are bound to solicitation and do not possess independent value to the customer apart from what often accompanies a successful solicitation.*" (*Id.* at p. 246 [120 L.Ed.2d at p. 200], italics added.)

*Application of section 381 and the Wrigley decision to the facts of this case*

 Utilizing either standard propounded in *Wrigley*, we have no problem concluding that the activities of the IRD personnel on behalf of Brown do not fit within the immunity provided by section 381.

First, it is clear from the majority opinion in *Wrigley* that only request-related activity qualifies for immunity. That is not the situation presented here.

IRD employees are employed within a separate division of Brown. They are not used to solicit sales from customers; that is the job of the 14 sales employees. In fact, IRD employees are excluded from accepting orders from retailers, taking possession of Brown products to be returned, maintaining or possessing any Brown products for their own inventory, or dealing with delinquent accounts; all activities which may be considered ancillary to solicitation of sales.

The IRD activity is not undertaken *in connection with sales activity.* It is undertaken independent of sales activity with the intent that in the future new retailers will exist, existing retailers will have expanded their capacity,

and the sales force will garner greater sales. The trial court correctly recognized the nature of this activity: "We know that the thinking behind the function [IRD] was that it would cement relations between the retailer and Brown shoe, number one. Number two, it would keep people in business longer and make them healthier companies. All which would lead to increased orders for Brown shoes. There doesn't seem to be any other purpose for the IRD function other than to see in the long run that there would be an increased amount of purchases of Brown shoes." We agree with this characterization of the IRD function, but not the result reached by the trial court in application of the law.

While the IRD activities may ultimately result in increased sales for Brown, they are not request related activities and do not facilitate the requesting of sales. As the court stated in *Wrigley*: "Although Wrigley argues that gum replacement was a 'promotional necessity' designed to ensure continued sales, . . . it is not enough that the activity facilitate sales; it must *facilitate the requesting of sales*, which this did not." (*Wisconsin Dept. of Revenue* v. *William Wrigley, Jr. Co., supra*, 505 U.S. at p. 233 [120 L.Ed.2d at p. 192], fn. omitted, italics added and deleted.)

Many of the services offered are not at all related to sales and are the type which a small retailer would have to pay a marketing or management service to duplicate. For example: financial analysis to determine the feasibility and potential for the new business; site selection; lease negotiation; store design; training of office personnel; provision of a bookkeeping system; and inventory management and control. None of these services fits within the standard enunciated by the majority because they are not request related activities and do not facilitate the requesting of sales.

Utilizing the standard enunciated in the dissent, much of the IRD activity also falls outside the immunity. The services provided to the retailers clearly result in added value to the retailers, services the retailers would normally have to facilitate through their own employees or by hiring independent contractors.

Brown emphasizes the fact that the IRD services were provided without charge to retailers. The trial court also made reference to this fact: "We know that the IRD function was not directly compensated for by the retailers." If Brown had charged for these services, the issue would have been much easier to decide. The following exchange took place while the Senate was considering enactment of section 381: "Senator Saltonstall: 'There is some question as to whether the sale of services is left out of the

bill. Am I correct in my understanding that the sale of services was omitted by the Committee on Finance in considering the subject, because the sale of services was not included in the Supreme Court decision [Northwestern-Stockham]?' [¶] Senator Talmadge: 'The Senator is entirely correct. The decision of the Supreme Court dealt only with the sale of commodities. For that reason, the sale of services was not included in the bill.'" (Interstate Income Tax Law (June 15, 1964) CCH State Tax Guide, ¶ 255.)

The fact that Brown does not charge for these services is not dispositive of the issue. The service of replacing stale gum was offered free of charge to the Wrigley retailers, yet the Supreme Court held that this service did not come within section 381 immunity. Further, the fact that no charge is made to the retailer demonstrates the added value of the services to the retailers, thus fitting within the minority standard stated in *Wrigley*.

While the case of *Briggs & Stratton Corp.* v. *Commissioner* (1968) 3 Ore. Tax 174 was decided before the standard enunciated in *Wrigley*, it is very similar to this case and would probably still be valid under the *Wrigley* standard: "Plaintiff's sales and service supervisor does more than solicit orders in Oregon when he gives technical engineering advice to customers, approves the appointment of service distributors, conducts training schools and lectures on the proper service techniques, and inspects the adequacy of the inventory, the tools and the shop at Tracey. [¶] Plaintiff's activities in Oregon exceed those allowed by 15 USCA section 381 and it is not exempt from taxation under the statute." (*Id.* at p. 180.)

### DISPOSITION

The judgment of the trial court is reversed and judgment in favor of FTB is to be entered, denying Brown's claim for the tax refund requested. Costs are awarded to FTB.

Vogel (C. S.), P. J., and Rubin, J.,* concurred.

A petition for a rehearing was denied May 14, 1996, and respondent's petition for review by the Supreme Court was denied August 14, 1996.

---

*Judge of the Municipal Court for the Santa Monica Judicial District sitting under assignment by the Chairperson of the Judicial Council.